IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

DIANE M. MARTIN individually and
Administratix of the Estate of *BLAINE
MARTIN, DECEASED,*

                              Plaintiff,

        v.

MATT CANESTRALE CONTRACTING,
INC. in its own right and as owner of the
Motor Vessel Mini 2 and her fleet or flotilla
of barges, and as owner or owner pro hac vice
of an empty, jumbo open hopper barge,

                              Defendant.

CIVIL ACTION NO.   08-303

***Memorandum Opinion***

CONTI, District Judge.

        In this memorandum opinion, the court considers the motion for summary judgment

(Doc. No. 28) filed by defendant Matt Canestrale Contracting, Inc. ("MCCI" or "defendant").

Plaintiff Diane Martin ("Diane Martin" or "plaintiff") is the widow of Blaine Martin ("Blaine

Martin" and together with Diane Martin, the "Martins"), an employee of MCCI who was found

dead on a barge in the care of MCCI.  In her complaint (Doc. No. 1), Diane Martin brought four

claims against defendant: (1) unseaworthiness (count I), (2) Jones Act negligence (count II), (3)

vessel negligence pursuant to 33 U.S.C. § 905(b) (count III), and (4) negligence/maritime tort

(count IV). In defendant's pending motion, defendant seeks summary judgment with respect to all four of plaintiff's claims. After considering the joint statements of material facts and the submissions of the parties, the court will grant defendant's summary judgment motion with respect to count I and count II and deny defendant's motion with respect to count III and count IV for the reasons set forth herein.

### *Factual Background*

This lawsuit originated from an apparent slip and fall that occurred on January 17, 2007. (See Def.'s App'x to Mot. for Summ. J. (Doc. No. 31), Ex. M (Washington County, Pennsylvania, Coroner's Report).) MCCI owned and operated motor vessels and barges on the Monongahela River. (Concise Stmt. of Material Facts (Doc. No. 41.), ¶ 11.) MCCI operated from a facility known as the Burrell Yard. (*Id.*) The Burrell Yard was located in Donora, Pennsylvania. (*Id.*)

**Blaine Martin**

MCCI employed deckhands, who worked on motor vessels. (*Id.* at 40). The employees who worked on the docks were referred to as "laborers." (*Id.*) The ticket collector was considered a laborer. (*Id.* at 41.) Blaine Martin held the position of ticket collector at MCCI. (Concise Stmt. of Material Facts, ¶ 36.)  As a ticket collector, his job consisted of taking tickets from truck drivers and facilitating and assisting truck drivers in the loading of coal from the trucks into a hopper, which is a funnel shaped receptacle for conveying coal to a barge. (*Id.*; App'x to Pl.'s Resp. in Opp'n to Mot. for Summ. J. (Doc. No. 36), Ex. 3 (Dallas Wingo Dep.) at 10-11.) The trucks would back into the loading area and dump the coal into the hopper. (Def.'s App'x to Mot. for Summ. J., Ex. I (Matt Canestrale Dep.) at 22-23.) If any coal spilled while it was being put into the hopper, which it often did, the ticket collector's responsibility was to shovel the coal into the

hopper. (App'x to Pl.'s Resp. in Opp'n to Mot. for Summ. J., Ex. 3 at 10-11; Ex. 5 at 13-14.)

Ticket collecting and loading of coal onto the barges took place on the dock. (Def.'s App'x to

Mot. for Summ. J., Ex. I at 22, 30, 40-43, 50-51.) Canestrale testified that the "ticket collector

just puts the ticket in one container and the stock pile in the other. In return, when he gets so

many, he takes them to the girl in the office, she marks them up where they go. She does the

paperwork." (*Id.* at 43.) Blaine Martin was not permitted to work on any vessels because he did

not take a drug test. (*Id.* at 76-77.)

Blaine Martin was not a master or member of any vessel that was owned or operated by

MCCI, nor was he assigned permanently to a vessel owned or operated by MCCI. Blaine Martin

did not have a valid merchant mariner's document at the time of his death, and Blaine Martin

spent less than thirty percent of his time working for defendant in the service of a vessel owned

or operated by MCCI. (Def.'s App'x to Mot. for Summ. J., Ex. J (Pl.'s Resp. to Def.'s First

Reqs. for Admis.), ¶¶ 1-6.)

On January 17, 2007, Blaine Martin came home from work at approximately 4:50 p.m.

(App'x to Pl.'s Resp. in Opp'n to Mot. for Summ. J., Ex. 6 (Diane Martin Dep.) at 92, 105.).

Upon coming home from work, Blaine Martin inquired when the Martins' daughter, Filomena,

finished work that evening. (App'x to Pl.'s Resp. in Opp'n to Mot. for Summ. J., Ex. 6 at 92.)

Diane Martin explained that Filomena was supposed to get off work at 8:00 p.m.  (*Id.*)  Blaine

Martin stated that he wanted to pick her up. (*Id.*)

That evening, the Monongahela River experienced high water conditions. (Concise Stmt. of

Material Facts, ¶ 42.) As a result of the high water conditions, Matt Canestrale ("Canestrale"),

owner of MCCI, called Blaine Martin at his residence at 5:34 p.m. and asked him to go to Burrell

Yard and check on the barges to make sure the barges were secure. (App'x to Pl.'s Resp. in

Opp'n to Mot. for Summ. J., Ex. 6 at 92-94.) Blaine Martin was given instructions to drive his car to the dock and observe the water level by looking to see how high the barges rose above the top of the dock. (Def.'s App'x to Mot. for Summ. J., Ex. I at 121-22.) Diane Martin testified that Blaine Martin told her before he left that he was not going to go onto any of the barges. (Def.'s App'x to Mot. for Summ. J., Ex. K (Diane Martin Dep.) at 106-07.) Plaintiff's expert, David L. Kroll ("Kroll"), a licensed marine engineer, explained that although Blaine Martin may have stated that he was not going to go onto the barges, the only way to "check" the status of the barges was to go physically onto one of the barges, Barge ACBL 2870, and visually inspect the lines that secured the barges. (App'x to Pl.'s Resp. in Opp'n to Mot. for Summ. J., Ex. 1 (Kroll Aff.), ¶¶ 1, 3.) The Burrell Yard was within a three to four minute drive of the Martins' house. (App'x to Pl.'s Resp. in Opp'n to Mot. for Summ. J., Ex. 6 at 91.)

At 6:30 p.m., Blaine Martin had not returned home from the Burrell Yard. (*Id.* at 94.) By 8:00 p.m., he was still not back; Diane Martin went to pick up Filomena at that time. (*Id.*) Neither Diane Martin nor Filomena could observe Blaine Martin's car as they drove past the Burrell Yard. (*Id.*) After arriving home, Diane Martin called Canestrale expressing concern about her husband's whereabouts. (*Id.* at 95-96; Concise Stmt. of Material Facts, ¶ 55.) After waking up the next morning, Diane Martin and Filomena drove past the Burrell Yard, and again they were not able to see Blaine Martin's car. (App'x to Pl.'s Resp. in Opp'n to Mot. for Summ. J., Ex. 6 at 95-96.) When they got back home, Diane Martin called Canestale on January 18, 2007 at approximately 10:00 a.m. (*Id.*; Concise Stmt. of Material Facts, ¶ 55.) After receiving Diane Martin's phone call, Canestrale asked his workers to search for Blaine Martin. (Def.'s App'x to Mot. for Summ. J., Ex. I, 133 (Canestrale Dep.).) Blaine Martin was found face down on the gunnel, which is the upper railing of a barge's side, of a loaded coal barge tied off to the dock

barge at the Burrell Yard. (Def.'s App'x to Mot. for Summ. J., Ex. L, 12 (Dilegge Dep.); Def.'s

App'x to Mot. for Summ. J., Ex. M.) Canestrale called Diane Martin and told her that "We found

him.  He's dead.  He had a heart attack." (App'x to Pl.'s Resp. in Opp'n to Mot. for Summ. J.,

Ex. 6 at 96.)  On January 19, 2007, the coroner of Washington County, Pennsylvania issued a

report which stated that Blaine Martin's "DEATH WAS ATTRIBUTED TO BLUNT FORCE

TRAUMA OF HEAD; BLUNT FORCE TRAUMA OF CHEST (ACCIDENTAL)."  (Def.'s

App'x to Mot. for Summ. J., Ex. M.)

### Barge ACBL 2870

   In 2003, the American Commercial Barge Line LLC sold Barge ACBL 2870 to scrap

service company Monongahela Iron & Metal Company ("MIMCO"). (Def.'s App'x to Mot. for

Summ. J., Ex. A (John W. Wray Aff.), ¶ 5.) MIMCO paid scrap value of $11,500.00 for Barge

ACBL 2870. (*Id*. ¶ 6.) Barge ACBL 2870 was 195 feet long, thirty-five feet wide, and over

twenty-one feet high. (App'x to Pl.'s Resp. in Opp'n to Mot. for Summ. J., Ex. 2 (Csamer Aff.),

¶ 4.) MIMCO lacked sufficient space to store Barge ACBL 2870. (Def.'s App'x to Mot. for

Summ. J., Ex. A, ¶ 8.) Because of the lack of space, MCCI agreed to store Barge ACBL 2870 at

a storage facility in Bunola, Pennsylvania. (*Id*. ¶¶ 8-10.) In late 2003, Canestrale proposed

exchanging with MIMCO barges containing approximately 300 tons of scrap metal for Barge

ACBL 2870, which consisted of approximately 300 tons of scrap metal. (*Id*. ¶¶ 11-12.) After

MCCI obtained Barge ACBL 2870, the barge was moved to the Burrell Yard. (*Id*. ¶ 13.)

Canestrale intended to use Barge ACBL 2870 as a dock at the Burrell Yard. (Def.'s App'x to

Mot. for Summ. J., Ex. E (Canestrale Aff.), ¶ 4.) As of November 10, 2008, however, Barge

ACBL 2870 was still listed as "in service" with the United States Coast Guard. (App'x to Pl.'s

Resp. in Opp'n to Mot. for Summ. J., Ex. 9.)

In 2003, MCCI hired a welder to cut a hole in the deck and rake of Barge ACBL 2870 and weld a steel spudwell to the deck and rake of the barge. (Def.'s App'x to Mot. for Summ. J., Ex. D (Def.'s Ans. to Pl.'s Third Set of Interrogs.), No. 1; Def.'s App'x to Mot. for Summ. J., Ex. E, ¶¶ 6-7.) MCCI placed a forty-foot long, thirty-inch wide steel spud[1] through the spudwell. (Def.'s App'x to Mot. for Summ. J., Ex. E, ¶ 6.) The spud was filled with concrete and weighed approximately 45,000 pounds. (Def.'s App'x to Mot. for Summ. J., Ex. C (Expert Report of John P. Colletti), at 2.) The spud was buried approximately ten feet into the riverbed. (Def.'s App'x to Mot. for Summ. J., Ex. E, ¶ 6.) Barge ACBL 2870 has been in its present location since spudded down in 2003. (*Id.* ¶ 8.)

Since the installation of the spud, Barge ACBL 2870 has served as the dock barge; it rises and falls with the water level of the river, which Canestrale testified eliminated the need to adjust the lines of barges tied to the dock barge. (Def.'s App'x to Mot. for Summ. J., Ex. E, ¶ 7.) Barge ACBL 2870 exhibits some wear and damage including wasting of shell plating and has numerous leaks resulting in the collection of water in the compartments of the barge. (Def.'s App'x to Mot. for Summ. J., Ex. C at 3-5.) Because of the amount of water that has materialized in the compartments of Barge ACBL 2870, water would need to be pumped from the barge before it could be used for transportation. (*Id.* at 7-9; App'x to Pl.'s Resp. in Opp'n to Mot. for Summ. J., Ex. 1 (David L. Kroll Aff.), ¶ 4(i).)

John P. Colletti ("Colletti"), a marine surveyor, submitted an expert report on behalf of MCCI regarding the condition of Barge ACBL 2870. Colletti received a degree in Marine Engineering from the State University of New York Maritime College and a degree in Marine Engineering from the United States Merchant Marine Academy. (Def.'s App'x to Mot. for

---

[1] A spud is a long, heavy column used to keep watercraft stationary.  WEBSTER'S THIRD INTERNATIONAL DICTIONARY 2212 (1993).

Summ. J., Ex. C at 11.) In 1970, Colletti also attained a graduate degree in Marine

Transportation from the State University of New York Maritime College. (*Id.*) Colletti has been

a registered certified marine surveyor since 1971. (*Id.*) His services include failure analyses of

hulls and machinery, fleeting and mooring analyses, and vessel structural and stability analyses.

(*Id* at 12.) With respect to the condition of Barge ACBL 2870, Colletti found that the cargo space

contained an estimated two feet of water at the forward end and an estimated five feet of water at

the after end. (*Id.* at 3.) Colletti also found up to six feet of water in the wing compartments. (*Id.*

at 5.) Externally, he found that the barge showed heavy wear and tear. The coaming had been

cutaway and removed on the starboard side. (*Id.* at 4.) This alteration weakens the structure and

increases the chances of buckling or catastrophic failure. (Def.'s App'x to Mot. for Summ. J., Ex.

C at 4.) The port coaming has been cutaway and removed beginning at forty-seven feet aft of the

headlog, which is the bow of the dock, and extending aft fourteen feet, weakening the structure.

(*Id.* at 4.) The rounded port corner also contains vertical fractures five feet long beginning at the

deck; the fractures open from one-fourth inch to three-fourths inch. (*Id.* at 5.) These fractures are

potential leaks. (*Id.*)  Colletti observed that Barge ACBL 2870 floats because of reserve

buoyancy, which is "that portion of the enclosed and watertight hull above the waterline which

allows the leaking vessel to continue to flood without resulting in sinking"; despite this

observation, he stated it does not rise to the level of safe navigation.  (Def.'s App'x to Reply

Mem. in Supp. of Summ. J., Ex. A.)

In order to remove the barge from its present location, Colletti believes that a towboat, a

work flat, a mud barge, a 150-ton crane equipped with a 150-ton load block and clamshell bucket

and at least two small spuds, and at least five pumps will be needed. (*Id.* at 7.) He estimates that

the removal of the barge from its present location would take at least three full days and would

cost approximately $35,000.00. (*Id.* at 9.) According to Colletti, the internal and external condition of the barge reduced the barge to a "hulk," and it is an old ship unfit for service. (*Id.* at 5-6, 10.) Colletti stated that in its present condition, the barge "leaks everywhere so that all compartments and the spaces along each side (wing voids) are river-full of water." (*Id.* at 5.) He expressed the opinion that, if an attempt was made to remove the barge from its current location without making substantial repairs to the barge, there is a substantial likelihood that the barge would sink. (*Id.*) He also was of the opinion that the barge could not carry the designer's original load capacity, because the steel plating on the sides deteriorated and the coamings were partially removed. (*Id.*) In Colletti's opinion, repairs to make the barge seaworthy could cost in excess of $107,000.00. (*Id.* at 10.) Because of the expense of repairing the extensive damage and the costs associated with removing the spud, Colletti concluded that the barge is unsound and unfit for service other than as a beached dock. (*Id.*)

Plaintiff obtained an expert opinion from Richard P. Csamer ("Csamer"). Csamer received a bachelor of science degree in mechanical engineering from West Virginia University in 1952. (App'x to Pl.'s Resp. in Opp'n to Mot. for Summ. J., Ex. 2, ¶ 1.) Before retiring in 1982, he was an employee of the United States Department of Energy in Coal and Gas Research as the Chief of the Engineering Design Section. (*Id.*) After retiring, he entered the field of safety and accident reconstruction involving commercial, industrial, vehicular, and personal accidents. (*Id.*) On October 15, 2005, Csamer inspected the Burrell Yard harbor and dock facility. (*Id.* ¶ 2.) He is of the opinion that Barge ACBL 2870 would have obstructed the view of anyone attempting to visualize the loaded barges from the shore. (*Id.* ¶ 6.) The other barges stored at the Burrell Yard were 175 feet long, twenty-six feet wide, and were less than twelve feet in height. (*Id.* ¶ 4.) This short height meant that other barges alongside Barge ACBL 2870 had approximately two feet of

freeboard, which is the vertical distance from the top of the barge to the water surface. (*Id.*) He opined that Barge ACBL 2870 would have stood at least eight feet higher than the other barges on the night of January 17, 2007. (*Id.* ¶ 5). Even assuming that there was lighting at the Burrell Yard on the night of Blaine Martin's death, Csamer believes that Barge ACBL 2870 would have cast a shadow over the loaded barges and lines riverward of Barge ACBL 2870, making it necessary for Blaine Martin to access Barge ACBL 2870 in order to complete the task of checking on the other barges and checking the water level. (*Id.* ¶ 6, 7.) With respect to the current status of Barge ACBL 2870, Csamer believes that removing the spud and casting off the stern line would take a short time and would make the barge transportable. (*Id.* ¶ 9.)

Plaintiff hired Kroll, a licensed marine engineer, to examine Barge ACBL 2870. Kroll resides in New Orleans, Louisiana. (App'x to Pl.'s Resp. in Opp'n to Mot. for Summ. J., Ex. 1, ¶ 1.) He is a licensed Marine Engineer and a graduate of the United States Merchant Marine Academy. (*Id.*) He was employed by Kroll Marine Surveying for twenty-six years, and offered hull, cargo, and machinery inspections, risk assessment, and marine safety development. (*Id.*) In preparation of his report for this case, Kroll reviewed the following documents: the Carroll Township police report and photographs, the United States Coast Guard report, the OSHA investigative file and citations, OSHA photographs taken on January 22, 2007, photographs taken by plaintiff's attorney on October 15, 2008, photographs of Barge ACBL 2870 taken by defendant's attorney, the report of Colletti, the United States Coast Guard certificate of documentation, affidavits of John W. Wray and Canestrale, a letter from the American Commercial Barge Lines to United States Coast Guard dated May 7, 2004, photographs taken by Csamer on October 15, 2008, a diagram of the harbor by Richard Csamer, and excerpts from the deposition of Canestrale. (*Id.* ¶ 2.) In his expert opinion, the only way for Blaine Martin to

9

"check" the barges was to go physically onto Barge ACBL 2870, which was the highest point of the loaded fleet. (*Id.* ¶ 3.)

Based upon Kroll's experience with barges, Kroll stated that "[b]arges that are sold as 'scrap' may still be capable of navigation." (*Id.* ¶ 4a.) He stated the usual maximum life of barges is not limited to twenty to twenty-five years; this opinion was in part based upon MIMCO's registered fleet of 113 barges over thirty-one years old. (*Id.* ¶ 4b.)

With respect to the spud and the spudwell, Kroll explained that once a spud is lifted from the river bottom, a vessel can be navigated to another location. The navigation is possible because the spudwell is water tight and cannot let water into the interior of the barge. (*Id*. ¶ 4d.) Kroll stated that having spuds on a barge does not make the barge a permanently moored vessel. (*Id.* ¶ 4e.) Kroll noted that a thirty-five ton crane could be used to remove the spud from Barge ACBL 2870. (*Id*. ¶ 4k.) A crane of that size can be rented for an hourly rate of $300.00. (*Id*.) He stated that once the crane is in place, it should only take minutes to raise the spud. (*Id*.) With respect to the size of the spud, Kroll is of the opinion that the spud on Barge ACBL 2870 measuring forty feet by thirty inches is not out of the ordinary, nor is it unusual that the spud is buried ten feet deep into the river bottom. (*Id.* ¶ 4f.)

Kroll also gave an expert opinion on the condition of Barge ACBL 2870. Kroll explains that the cutting away of the coaming does not prevent the barge from being navigated to another location, and such damage is common on barges that have been in service for over twenty years. (*Id.* ¶ 4h.) In order to determine the ingress of water in the void compartments, the void compartments need to be pumped and checked, which is a common procedure in the river industry. (*Id.* ¶ 4i.) Typically, a barge is pumped when the void compartments have three inches to six inches of water in them. (*Id*.)

### Standard of Review

Federal Rule of Civil Procedure 56(c) provides that summary judgment may be granted if, drawing all inferences in favor of the nonmoving party, "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c).

The nonmoving party must point to specific affirmative evidence in the record, rather than rely upon conclusory or vague allegations or statements. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). Concrete evidence must be provided for each element of each of the claims, and the evidence must be such that a reasonable fact-finder could find in that party's favor at trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). "A nonmoving party, like plaintiff, must 'designate specific facts showing that there is a genuine issue for trial.'" *Orenge v. Veneman*, No. 04-297, 2006 WL 2711651, at *6 (W.D. Pa. Sept. 20, 2006) (citing *Celotex*, 477 U.S. at 324).

A motion for summary judgment will not be defeated by the mere existence of some disputed facts, but will be defeated when there is a genuine issue of material fact. *Anderson*, 477 U.S. at 248. In determining whether the dispute is genuine, the court's function is not to weigh the evidence or to determine the truth of the matter, but only to determine whether the evidence of record is such that a reasonable jury could return a verdict for the nonmoving party. *Id.* at 249. The court may consider any evidence that would be admissible at trial in deciding the merits of a motion for summary judgment. *Horta v. Sullivan*, 4 F.3d 2, 8 (1st Cir. 1993); *Pollack v. City of Newark*, 147 F. Supp. 35, 39 (D.N.J. 1956), *aff'd*, 248 F.2d 543 (3d Cir. 1957) ("in

considering a motion for summary judgment, the court is entitled to consider exhibits and other papers that have been identified by affidavit or otherwise made admissible in evidence").

### *Discussion*

## A. Count I (Unseaworthiness) and Count II (Negligence)

In counts I and II of plaintiff's complaint, plaintiff brings claims of unseaworthiness under general maritime law and negligence under the Jones Act, 46 U.S.C. § 30104. Defendant moved for summary judgment, alleging that plaintiff cannot assert claims of unseaworthiness and Jones Act negligence because Blaine Martin was not a seaman, and both claims are only available to a seaman.

Under the Jones Act, a seaman who is injured in the course of employment may bring suit against his or her employer. If a seaman dies from the injury, the personal representative of the seaman can bring suit against the employer. "A seaman injured in the course of employment or, if the seaman dies from the injury, the personal representative of the seaman may elect to bring a civil action at law, with the right of trial by jury, against the employer." 46 U.S.C. § 30104. The injured party must be a seaman. *See Braen v. Pfeifer Oil Transp. Co.*, 361 U.S. 129, 137 n.5 (1959) (noting there are "two separate requirements of the Jones Act, namely, that the plaintiff have the status of a 'seaman,' and that his injury must have been suffered 'in the course of his employment' as such."). An unseaworthiness claim is "a strict liability claim alleging that the defendant shipowner failed to provide a vessel reasonably fit for its intended use." *Olsen v. Am. S.S. Co.*, 176 F.3d 891, 895 (6th Cir. 1999). The individual asserting an unseaworthiness claim must be a seaman. 33 U.S.C. § 905(b); s*ee Yamaha Motor Corp. v. Calhoun*, 516 U.S. 199, 208 n.6 (1996).

To determine whether an employee is a seaman for maritime purposes, the Supreme Court established a two-step analysis. *Chandris, Inc. v. Latsis*, 515 U.S. 347, 368 (1995). The plaintiff must first demonstrate that his duties "contribut[e] to the function of a vessel or to the accomplishment of its mission." *Id.* (quoting *McDermott Int'l, Inc. v. Wilander*, 498 U.S. 337, 355 (1991)). The second step requires the plaintiff to establish that he or she has "a connection to a vessel in navigation . . . .that is substantial in terms of both its duration and its nature." *Chandris*, 515 U.S. at 368. In order to satisfy the durational requirement, as a general rule, an employee must spend at least thirty percent of his or her time on a vessel. *Id*. at 371.

> This figure of course serves as no more than a guideline established by years of experience, and departure from it will certainly be justified in appropriate cases. As we have said, "[t]he inquiry into seaman status is of necessity fact specific; it will depend on the nature of the vessel and the employee's precise relation to it."

*Id.* (quoting *Wilander*, 498 U.S. at 356).

In the motion for summary judgment, defendant argued that plaintiff admitted at her deposition that Blaine Martin was not a master or member of any vessel owned or operated by MCCI, Blaine Martin was not assigned to any vessel owned or operated by MCCI, Blaine Martin did not have a valid merchant mariner's document at the time of his death, and Blaine Martin spent less than thirty percent of his time on a vessel owned or operated by MCCI. Because of these admissions, plaintiff concedes that Blaine Martin was not a seaman under the two-step analysis set forth in *Chandris.* Plaintiff moved voluntarily to dismiss count I and count II of the complaint (*See* Pl.'s Br. in Opp'n to Def.'s Mot. for Summ. J. at 3.) Since Diane Martin does not challenge the summary judgment motion with respect to counts I and II, the court grants MCCI's motion with respect to these counts.

**B. Count III (Vessel Negligence under 33 U.S.C § 905(b))**

**1. Whether Plaintiff is Covered by the LHWCA[2]**

In count III of plaintiff's complaint, plaintiff brings a claim under the Longshore and Harbor Workers' Compensation Act ("LHWCA"), 33 U.S.C. §§ 901 *et seq.*  The LHWCA provides that a longshore or harbor worker can recover damages for an injury suffered on a vessel if the injury is a result of the vessel owner's negligence.

> [C]ompensation shall be payable under [the LHWCA] in respect of disability or death of an employee, but only if the disability or death results from an injury occurring upon the navigable waters of the United States (including any adjoining pier, wharf, dry dock, terminal, building way, marine railway, or other adjoining area customarily used by an employer in loading, unloading, repairing, dismantling, or building a vessel).

33 U.S.C. § 903(a).  In order to recover damages due to vessel negligence under the LHWCA, two conditions must be met: the injured party must qualify as a longshore or harbor worker, and the injury must have taken place on a vessel. Plaintiff argues that Blaine Martin qualifies as a longshore or harbor worker and was injured on a vessel, and can therefore recover under the LHWCA.

The LHWCA covers "any person engaged in maritime employment, including any longshoreman or other person engaged in longshore operations, and any harbor-worker including a ship repairman, shipbuilder, and shipbreaker." 33 U.S.C. § 902(3). Those who are "engaged by a master to load or unload or repair any small vessel under eighteen tons net" are not covered under the LHWCA. 33 U.S.C. § 902(3)(H).

The LHWCA provides that "compensation shall be payable under [the LHWCA] in respect of disability or death of an employee." 33 U.S.C. § 903(a). Compensation is defined as

---

[2] Defendant does not seek summary judgment on this issue. Defendant, however, "denies that Martin was engaged in maritime employment." (Def.'s Mem. in Supp. of Mot. for Summ. J. at 10 n.1.) The court will address the issue and the relevant evidence for the sake of completeness.

"the money allowance payable to an employee or to his dependents as provided for in [the

LHWCA], and includes funeral benefits provided therein." 33 U.S.C. § 902(12). The LHWCA

also provides a system for calculating the compensation that should be awarded to a widow of a

deceased employee who sustained his or her injury on a vessel belonging to the employer. *See* 33

U.S.C. § 909(b). Plaintiff, although neither a person engaged in maritime employment nor a

harbor worker, is covered under the LHWCA because she was a dependent of Blaine Martin.[3]

In contrast to the LHWCA, the Jones Act was enacted to provide a remedy for sea-based

employees. *See* 46 U.S.C. §§ 30104, 30105. The Supreme Court has expressed the view that "the

Jones Act and the LHWCA are complementary regimes that work in tandem: The Jones Act

provides tort remedies to *sea*-based maritime workers, while the LHWCA provides workers'

compensation to *land*-based maritime employees." *Stewart v. Dutra Constr. Co.*, 543 U.S. 481,

488 (2005). The issue in this case is whether Blaine Martin was a land-based maritime employee.

In *Northeast Marine Terminal Co. v. Caputo*, 432 U.S. 249 (1977), two employees

brought actions against their employers under the LHWCA. The first plaintiff was a "checker."

As a checker, his job responsibilities included checking and recording cargo as it was loaded or

unloaded from vessels or barges. One day while checking a package on the dock, he slipped and

fell on a patch of ice. *Id.* at 253. The second plaintiff was a member of a longshoring "gang,"

which was responsible for loading and unloading ships. The gang's responsibilities included the

loading of trucks with cargo that had been delivered by ship.  The plaintiff was injured while

rolling a dolly loaded with cargo into a truck. *Id.* at 254.

Prior to 1972, the LHWCA

> did not cover longshoremen killed or injured on a pier while
> attaching cargo to ships' cranes for loading onto the ships, even
> though coverage might have existed had the men been hurled into

---

[3] MCCI does not dispute that Diane Martin, as the widow of Blaine Martin, was his dependent.

> the water by the accident, or been injured on the deck of the ship
> while performing part of the same operation.

*Id.* at 259-60 (internal citations omitted).  By 1972, however, Congress recognized "that modern technology had moved much of the longshoreman's work onto the land" and "[c]overage of the present [LHWCA] stops at the water's edge." *Id.* at 262.

> To remedy these problems, Congress extended the coverage shoreward. It broadened the definition of "navigable waters of the United States" to include "any adjoining pier, wharf, dry dock, terminal, building way, marine railway, or other adjoining area customarily used by an employer in loading, unloading, repairing, or building a vessel." At the same time, Congress amended the definition of the persons covered by the Act. Previously, so long as a work-related injury occurred on navigable waters and the injured worker was not a member of a narrowly defined class, the worker would be eligible for federal compensation provided that his or her employer had at least one employee engaged in maritime employment. It was not necessary that the injured employee be so employed. But with the definition of "navigable waters" expanded by the 1972 Amendments to include such a large geographical area, it became necessary to describe affirmatively the class of workers Congress desired to compensate. It therefore added the requirement that the injured worker be "engaged in maritime employment," which it defined to include "any longshoreman or other person engaged in longshoring operations, and any harborworker including a ship repairman, shipbuilder, and shipbreaker, but . . . not . . . a master or member of a crew of any vessel, or any person engaged by the master to load or unload or repair any small vessel under eighteen tons net."

*Id.* at 263-64. The Supreme Court explained that, as a result of the 1972 amendments, there are two tests for eligibility under the LHWCA, both of which must be met: the "status" test and the "situs" test. *Id.* at 264-65.

With respect to the status test, the Court noted that an employee must be "engaged in maritime employment" at the time of injury. *Id.* at 265. Congress failed to define key terms such as "maritime employment," "longshoreman," or "longshoring operations" in the text of the LHWCA or its legislative history. Congress made clear, however, that certain employees on the

situs but not engaged in loading or unloading vessels are excluded, such as truckdrivers and those who perform purely clerical tasks. *Id.*

The Supreme Court held that the first plaintiff (the checker) was an "employee" under the LHWCA, because his job duties, which included checking and marking items of cargo as they were unloaded from containers, were "an integral part of the unloading process as altered by the advent of containerization." *Id.* at 271. The Supreme Court held that the second plaintiff (the member of the longshoring gang) was also an "employee" under the LHWCA. The Court stated that "Congress wanted a uniform compensation system to apply to employees who would otherwise be covered by [the LHWCA] for **part of their activity**," and Congress had an "obvious desire" to provide coverage for "longshoremen whether or not their particular task at the moment of injury is clearly a 'longshoring operation.'" *Id.* at 272, 276 (internal quotations omitted) (emphasis added). The Supreme Court explained that:

> The Act focuses primarily on occupations longshoreman, harbor worker, ship repairman, shipbuilder, shipbreaker. Both the text and the history demonstrate a desire to provide continuous coverage throughout their employment to these amphibious workers who, without the 1972 Amendments, would be covered only for part of their activity. It seems clear, therefore, that when Congress said it wanted to cover "longshoremen," it had in mind persons whose employment is such that they spend at least some of their time in indisputably longshoring operations and who, without the 1972 Amendments, would be covered for only part of their activity.

*Id.* at 273. Although the second plaintiff was loading a truck at the time of the accident, the Supreme Court looked to the variety of tasks the longshoring gang performed. Had the second plaintiff not been injured, he could have been assigned to loading or unloading a vessel immediately after loading the truck. *Id.* "[T]o exclude him from the [LHWCA's] coverage in the morning but include him in the afternoon would be to revitalize the shifting and fortuitous coverage that Congress intended to eliminate." *Id.* at 274.

With respect to the situs test, the LHWCA provides that the covered sites are the navigable waters of the United States, "including any adjoining pier, wharf, dry dock, terminal, building way, marine railway, or other adjoining area customarily used by an employer in loading, unloading, repairing or building a vessel." *Id.* at 279. Terminal areas meet the situs test, "because the terminal adjoins navigable waters of the United States and parts of the terminal are used in loading and unloading ships." *Id.*

In *Chesapeake and Ohio Railway Co. v. Schwalb*, 493 U.S. 40 (1989), two plaintiffs were injured at their employer's coal loading terminal in Norfolk, Virginia. The Supreme Court explained that, at this particular site,

> [t]he loading process begins when a hopper car is rolled down an incline to a mechanical dumper which is activated by trunnion rollers and which dumps the coal through a hopper onto conveyor belts. The belts carry the coal to a loading tower from which it is poured into the hold of a ship. The trunnion rollers are located at each end of the dumper. Typically, some coal spills out onto the rollers and falls below the conveyor belts during the loading process. This spilled coal must be removed frequently to prevent fouling of the loading equipment.

*Id.* at 42-43. The plaintiffs were employed as "laborers doing housekeeping and janitorial services. One of their duties was to clean spilled coal from the trunnion rollers and from underneath the conveyor belts." *Id.* at 43. The Supreme Court stated "[c]overage is not limited to employees who are denominated 'longshoremen.'" *Id.* at 47. The Court concluded that the plaintiffs

> were performing duties essential to the overall loading process. There is testimony in the record that if the coal which spills onto the rollers is not periodically removed, the rollers may become clogged and the dumper will become inoperable. The same is true of the coal that falls beneath the conveyor belts. Testimony indicated that a buildup of such coal could eventually foul the conveyors and cause them to be shut down. Equipment cleaning

> that is necessary to keep machines operative is a form of
> maintenance and is only different in degree from repair work.

*Id.* at 48 (internal citations omitted).

In this case, plaintiff adduced sufficient evidence that Blaine Martin satisfies both the status and situs tests. Blaine Martin, an employee of MCCI, worked at the Burrell Yard with the official title of ticket collector. Under the status test, only a portion of Blaine Martin's job responsibilities have to involve longshoring operations, as the Supreme Court explained in *Caputo*. Here, viewing the evidence in the nonmoving party's favor, there is evidence Blaine Martin's position as ticket collector had two job responsibilities: collecting tickets from truck drivers, and loading into hoppers the coal that was spilled during dumping. Defendant did not argue that Blaine Martin's engagement in either one of these tasks was "'so momentary or episodic' as to be insufficient to confer coverage." *Maher Terminals, Inc. v. Director, Office of Workers' Comp. Programs*, 330 F.3d 162, 169-70 (3d Cir. 2003) (quoting *Boudloche v. Howard Trucking Co.*, 632 F.2d 1346, 1348 (5th Cir. 1980)).  If either one of these tasks qualify as maritime employment plaintiff meets the status test.

Loading cargo onto a vessel qualifies as maritime employment. Plaintiff adduced evidence that Blaine Martin physically handled cargo, since at times he had to shovel coal that was spilled during dumping and he had to load that coal into a hopper. Placing coal into a hopper was part of the "overall loading process" as detailed in *Schwalb*. Although there is no evidence that Blaine Martin had to shovel spilled coal for maintenance purposes like the two plaintiffs in *Schwalb*, Blaine Martin was performing a similar task. There is no principled basis for distinguishing between shoveling coal for loading purposes and shoveling coal for maintenance purposes; both qualify as part of the loading process. Blaine Martin's duty of shoveling spilled coal satisfies the status test.

Ticket collecting also qualifies as maritime employment and meets the status test. In *Maher Terminals*, the plaintiff's employment was split evenly between working as a checker and as a delivery clerk.  When he "worked as a checker, he was required to be in the shipping lanes, but when employed as a delivery clerk, [the plaintiff] worked exclusively in the office entering data into a computer. In both jobs, his function was to handle paperwork for the in-coming and out-going cargo." *Maher Terminals*, 330 F.3d at 164. The plaintiff was injured on a day he was working as a delivery clerk. The Court of Appeals for the Third Circuit stated his assignment as a checker was "an indisputably longshoring job." *Id.* at 170. Blaine Martin's ticket collecting job is similar to the position of a checker. He worked as a ticket collector in the terminal area, and "**handle[d]** paperwork for the in-coming . . . cargo." *Id.* at 164 (emphasis added). By contrast, "the girl in the office" who "**does** the paperwork" would perform uncovered clerical tasks. (Def.'s App'x to Mot. for Summ. J., Ex. I at 43 (emphasis added).)

Under the situs test, the accident must occur on navigable waters.  Navigable waters are defined under the LHWCA to include piers, wharfs, dry docks, terminals, marine railways, and other loading areas. There is no dispute that Blaine Martin's accident occurred on navigable waters, and plaintiff meets the situs test.

Crediting plaintiff's version of Blaine Martin's job duties, Blaine Martin was hired as a ticket collector, but was often required to help truck drivers load coal onto the barges. Ticket collecting and loading of coal onto the barges took place on the dock. Accepting the facts as supplied by plaintiff, Blaine Martin's activities as ticket collector and coal loader contributed significantly to maritime activities. Defendant did not move for summary judgment on this issue, which is an implicit admission that there is a genuine issue of material fact about whether Blaine Martin can be considered as a longshore or harbor worker for purposes of the LHWCA.

**2. Whether the Injury Plaintiff Suffered Was Caused By the Negligence of a Vessel**

The LHWCA states that, "in the event of injury to a person covered under [the LHWCA] caused by the negligence of a vessel, then such person, or anyone otherwise entitled to recover damages by reason thereof, may bring an action against such vessel . . . ." 33 U.S.C. § 905(b). Plaintiff based count III upon 33 U.S.C. § 905(b). (*See* Compl. ¶ 30.) In its motion for summary judgment, defendant argues that Barge ACBL 2870, the dock barge where Blaine Martin sustained his life-ending injury, cannot be considered a vessel and therefore plaintiff is not entitled to recovery under the LHWCA because of the negligence of the barge.

The LHWCA does not define the word "vessel." The definition of a vessel has been a subject of controversy for many years. The Supreme Court first analyzed the issue in *Cope v. Vallette Dry-Dock Co*., 119 U.S. 625, 626, 630 (1887), and made a distinction between watercraft capable of maritime transportation and watercraft incapable of maritime transportation. The case involved a dry dock that was used to repair vessels. The dry dock had no means of propulsion, and the dock was moored in the same location for twenty years. *Id.* at 627. The Supreme Court stated a

> fixed structure, such as this dry-dock is, not used for the purpose of navigation, is not a subject of salvage service, any more than is a wharf or a warehouse when projecting into or upon the water. The fact that it floats on the water does not make it a ship or vessel, and no structure that is not a ship or vessel is a subject of salvage. . . . A ship or vessel, used for navigation and commerce, though lying at a wharf, and temporarily made fast thereto, as well as her furniture and cargo, are maritime subjects, and are capable of receiving salvage service.

*Id.* at 627-28. The Supreme Court held that the dry dock was not a vessel, because the watercraft was not practically capable of being used for maritime activities, such as the transportation of people, freight, or cargo. *Id* at 630. Because the dry dock had no means of propulsion and it was

permanently moored for over twenty years, the court reasoned that the dry dock was a fixed structure and therefore an extension of the land. *Id.*

In 1947, Congress enacted 1 U.S.C. § 3,[4] which essentially codified the definition of a vessel set forth in *Cope*. The section defined a vessel as any "watercraft or other artificial contrivance used, or capable of being used, as a means of transportation on water." 1 U.S.C. § 3. The statute provides two situations in which a watercraft can qualify as a vessel: (1) if the watercraft is being used as a means of transportation on water or (2) if the watercraft is capable of being used as a means of transportation on water.

The Supreme Court provided a framework for determining the vessel status of a watercraft in *Stewart v. Dutra Construction Co.*, 543 U.S. 481 (2005). *Stewart* involved the question whether a dredge, which is a massive floating platform used to remove silt from the ocean floor, constituted a vessel. The dredge in question had a limited means of self propulsion. The dredge was navigated short distances by manipulating its anchors and cables, and moved long distances by tugboat.  Although it could move short distances, at the time of the accident the dredge was idle due to an engine malfunction. The plaintiff, a marine engineer, was hired to work on the dredge's mechanical systems, and was seriously injured while working. *Id.* at 484-85. In *Stewart*, the Supreme Court asserted "[1 U.S.C.] § 3 sweeps broadly." *Id.* at 494. The Court rejected the lower court's conclusion that, because the vessel's primary purpose was not navigation or commerce, it was not a vessel. It reasoned that 1 U.S.C. § 3 requires only that a watercraft be "used or capable of being used, as a means of transportation of on water" to qualify as a vessel, and the provision "does not require that a watercraft be used **primarily** for that purpose." *Id.* at 495. The Supreme Court additionally explained that a watercraft does not need to be in motion to qualify as a vessel; "whether a watercraft is motionless or moving is the sort of

---

[4] Title 1, Chapter 1 of the United States Code contains generally applicable rules of construction for federal statutes.

'snapshot' test" that the Supreme Court rejected in other cases. *Id.* The Supreme Court determined that the key inquiry is whether the dredge's use as a means of transportation on water is a "practical possibility or merely a theoretical one. In some cases that inquiry may involve factual issues for the jury." *Id.* at 496 (internal citation omitted). "Under [1 U.S.C.] § 3, a 'vessel' is any watercraft practically capable of maritime transportation, regardless of its primary purpose." *Id.* at 497.

The Supreme Court noted a "distinction drawn by the general maritime law between watercraft temporarily stationed in a particular location and those permanently affixed to shore or resting on the ocean floor." *Id.* at 494. "Simply put, a watercraft is not 'capable of being used' for maritime transport in any meaningful sense if it has been permanently moored or otherwise rendered practically incapable of transportation or movement." *Id.* The Court also stated, however, that a ship

> long lodged in a drydock or shipyard can again be put to sea, no less than one permanently moored to shore or the ocean floor can be cut loose and made to sail. The question remains in all cases whether the watercraft's use "as a means of transportation on water" is a practical possibility or merely a theoretical one.

*Id.* at 496. The permanency of the mooring, therefore, may be evidence whether the watercraft's use as a means of transportation is practical, but permanency is not the sole inquiry and is not the only factor.

In *United States v. West Indies Transport, Inc.*, 127 F. 3d 299, 309 (3d Cir. 1997), the Court of Appeals for the Third Circuit applied the definition of a vessel set forth in 1 U.S.C. § 3. In 1987, West Indies Transport obtained permits to use five barges as fixed docks for other vessels. In 1989, a hurricane damaged several of these barges, and moved them from their permitted positions. West Indies Transport did not attempt to repair or reposition the damaged

barges. The barges were instead used "as docks, repair facilities, and housing for employees in their new unauthorized locations. In the process, West Indies Transport attached the barges permanently to shore, constructed walkways and ramps between the barges for use by vehicles and employees, and wired them for electricity." *Id.* at 303-04. The Court of Appeals for the Third Circuit observed that the evidence presented at trial was that the "barge was half submerged in the water of Krum Bay, with part of the hull resting on the bottom and with water visible below decks. The barge could not be moved from its mooring." *Id.* at 309. The court of appeals concluded that there was sufficient evidence for the jury to find that the barge was not a vessel. *Id.*[5]

*Gross v. Tonomo Marine, Inc*., No. 02-1317, 2005 U.S. Dist. LEXIS 24323, at *3 (W.D. Pa. July 25, 2005) (r*eport and recommendation adopted by Gross v. Tonomo Marine, Inc*., No. 02-1317, 2005 U.S. Dist. LEXIS 17668 (W.D. Pa. Aug. 23, 2005)), involved a flat-bottomed platform crane that was sitting on a barge; the barge was floating and was anchored into the river bed by a spud. The barge had no means of self-propulsion, but was capable of being towed to various locations. *Id* at *3. While the plaintiff was unloading bundles of iron ingots from a barge onto a flatbed truck, the plaintiff was injured when struck by the beam of the crane. The crane was owned by his employer. *Id.* The plaintiff sued his employer alleging negligence in violation of general maritime obligations. The plaintiff moved for summary judgment on the issue whether the "crane barge" was a vessel. *Id.* at **4-5. The court granted the plaintiff's motion, holding that the employer's "crane barge was . . . .a 'vessel' for purposes of admiralty law." *Id.* at **16-17.

Here, Barge ACBL 2870 was stationary and was not being used as a means of transportation on water. The issue, therefore, is whether Barge ACBL 2870 was capable of being

---

[5] The court of appeals did not consider whether the barges when used as "dock barges," which was their permitted use, qualified as vessels. Such a use was likely similar to the use of Barge ACBL 2870 in this case, but that issue was not before the Court of Appeals for the Third Circuit.

used as a means of transportation on water. In order to make this determination, it must be determined whether it was a practical possibility or merely a theoretical possibility that the watercraft could be used as a means of transportation. *Stewart*, 543 U.S. at 496. In pure theory, virtually any dock barge can be converted into a floating object and used for nautical transportation. Based upon Supreme Court precedent, the issue is whether such a conversion is practical. Defendant's purpose with respect to the future use of Barge ACBL 2870, although a relevant factor, is not controlling; the court must determine whether the watercraft is capable of being used for transportation. *See Stewart*, 543 U.S. at 495 (even though the dredge's primary purpose was not transportation, it was still a vessel since 1 U.S.C. § 3 does not require that the primary purpose be transportation; "the [dredge] was not only 'capable of being used' to transport equipment and workers over water – it was used to transport those things").

Viewing the evidence in favor of the nonmoving party in this situation, Barge ACBL 2870 could practically be used as a means of maritime transportation. Kroll was a licensed marine engineer and had experience in inspecting the hulls of ships. Kroll opined that the spud, measuring forty feet long and thirty inches wide, was of a regular size. Kroll also opined that the spud was placed at a normal depth in the bed of the river – ten feet. More importantly, he stated that the spud could be raised in a matter of minutes, and at a relatively modest cost. Fastening a barge to the river bottom and using the barge as a work platform does not necessarily preclude the barge from qualifying as a vessel. *Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.*, 513 U.S. 527, 535 (1995). Again, the court notes that the key is whether the removal of the spud that affixes the barge to the river bed is practical. There is evidence in the record from which a reasonable jury could conclude that the removal is practical.

With respect to whether the barge could be moved from its position and used in transportation, Kroll was of the opinion that removal of the spud from the spudwell would not lead to leakage. Csamer, an expert in the field of safety and accident reconstruction who personally inspected Barge ACBL 2870 prior to Blaine Martin's accident, opined that the removal of the spud would make the barge transportable. Although Colletti noted flooding within certain interior chambers of Barge ACBL 2870 and provided a report of the deterioration and damage to the barge, a reasonable fact-finder, if Kroll's testimony is credited, could conclude that such flooding or damage would not cause the barge to sink. Canestrale testified that Barge ACBL 2870, as a dock barge, rises and falls with the water level of the river; Colletti also stated that the barge floats as a result of reserve buoyancy.  Although Colletti stated that the pumping of water from void compartments is necessary to establish a safe level of navigation for the barge, Kroll stated that the pumping of water is a routine procedure.[6] There is no evidence that the necessary pumping would be an extraordinary undertaking, although the parties dispute the cost of such a procedure. Kroll opined that the damage to Barge ACBL 2870 was not unusual for a barge of its age, and that many barges in a similar condition are still in service. Accepting plaintiff's version of the facts as true, the spud that is mooring Barge ACBL 2870 can be removed within a short period of time, and the barge can be pumped. A reasonable fact-finder could determine that there is a practical possibility that the barge is capable of maritime transportation.

In its briefs, defendant argues that Kroll has never seen Barge ACBL 2870 and thus his conclusions about the necessary steps for mobilizing the barge should be afforded little weight.

---

[6] Defendant argues that Kroll's statement that barges are typically pumped when compartments have three to six inches of water in them is irrelevant.  Kroll also stated, however, that pumping and checking compartments is a common procedure.  Defendant did not present evidence that pumping three to six feet of water is impossible. Csamer stated that the removal of the spud and stern line would make Barge ACBL 2870 transportable, creating an issue of fact for the jury.

Weighing the evidence, however, is a task for the jury, not the court in ruling upon summary judgment. "While testimony based on the personal observations of the expert is preferable, neither the Federal Rules of Evidence nor the case law insist on personal examination." 33A LAWYER'S COOPERATIVE PUBLISHING, FEDERAL PROCEDURE, LAWYER'S EDITION § 80:251, at 411 (2003). An expert's opinion is acceptable so long as it is based upon information that is commonly used by experts in the relevant field. "Reports and statements of others . . ., while not as valuable as testimony based on the expert's own observations, can provide a reliable basis for the expert's opinion, at least when reliance on such sources is the custom of the discipline." *Id.* There is no contention that the opinions of plaintiff's experts do not have sufficient bases. Besides Kroll, plaintiff presented the report of Csamer, who opined that the barge was movable. Csamer did inspect the barge, albeit two years before the accident.

Defendant is correct in stating that to "determine whether a watercraft is a vessel, courts must consider how 'permanently' a watercraft is moored," and that if "the subject watercraft is moored in a manner that makes its future use in navigation unlikely or impossible, the watercraft is not a vessel." (Def.'s Mem. in Supp. of Mot. for Summ. J. at 16.) Plaintiff presented evidence in this case that the removal of mooring is possible, and can be quickly and relatively economically done. The permanency of the mooring is only one of several relevant factors to consider when analyzing whether maritime transportation is practical.

The decisions cited by defendant in which the court found that a permanently moored watercraft was not a vessel are factually distinguishable from this case. In *De La Rosa v. St. Charles Gaming Co.*, 474 F.3d 185, 186 (5th Cir. 2006), the plaintiff tripped and fell on the carpeting of a floating boat used as a casino. The Court of Appeals for the Fifth Circuit stated that "*Stewart* expanded the definition of vessel to include more unconventional watercrafts than

we had previously thought." *Id.* at 187. The court of appeals held that although the casino was "physically capable of sailing, such a use was merely theoretical." *Id.* The critical facts to the court of appeals included that the casino was indefinitely moored to the land for several years by lines that were tied to steel pilings, and the casino operator did not intend on removing the lines. The casino received water, telephone lines, sewer lines, cable television, and data-processing lands from land-based sources. Additionally, the casino operator's business was "entirely gaming related, and not maritime in nature." *Id.*

In *Wire v. Showboat Marina Casino Partnership*, No. 06-cv-6139, 2008 WL 818310 (N.D. Ill. Mar. 20, 2008), an employee of a riverboat casino sued her employer. The court stated that the casino's location in a boat "does not make [it] any more [a vessel] than a land casino is considered a vessel." *Id.* at *4. The customers used the casino for gambling and entertainment, and not to cruise on waterways. *Id.* The casino was secured to shore by four hydraulic winches, and was granted "continuously moored" status by the United States Coast Guard. *Id.* at *5. The Coast Guard additionally issued a certificate stating that the casino could not sail in its condition. *Id.* at *6. The court granted the employer's motion for summary judgment, concluding the employee did not present sufficient evidence that the casino was a vessel. *Id.* at *7.

In *In re Grand Casino of Mississippi, Inc.-Biloxi*, No. 06-cv-195, 2007 WL 188265, at *1 (S.D. Miss. Jan. 23, 2007), the court considered the situation where Hurricane Katrina had caused two docked casino barges to leave their moorings and travel over 3,000 feet inland. The casino barges caused property damage. Both casinos were held into place by a mooring cell system anchored in the seabed.  The casinos were used solely for gaming purposes after they were moored into place. *Id.* The court noted "[c]learly, the *Stewart* decision 'has significantly enlarged the set of unconventional watercraft that are vessels under the Jones Act and the

[LHWCA].'" *Id.* at *3 (quoting *Holmes v. Atlantic Sounding Co.*, 437 F.3d 441, 448 (5th Cir. 2006).) The court, however, concluded that the functional and nautical characteristics of the two casino barges were indistinguishable from those in *De La Rosa*, and granted the defendant's motion to dismiss. *In re Grand Casino of Mississippi, Inc.-Biloxi*, 2007 WL 188265, at **3-4.

This case is distinguishable. All the above decisions relied upon by defendant involved casinos that were for gaming and entertainment purposes, whereas Barge ACBL 2870 was used as a dock barge. Based upon the evidence adduced by plaintiff, the spud is not necessarily permanent. The evidence establishes that many barges are capable of navigation even with spuds and spudwells. Barge ACBL 2870 is not attached to the shore with any kind of utility line, implicating that utility lines are not necessary for the barge's key functions.[7] There is no evidence of record that the Coast Guard considered Barge ACBL 2870 permanently moored.  By contrast, there is evidence that the barge was listed with the Coast Guard as still being in service.

Defendant also cites *Jordan v. Shell Oil Co.*, No. G-06-265, 2007 WL 2220986, at *1 (S.D. Tex. Aug. 2, 2007), in which the plaintiff was injured while working on a tension leg platform owned by the defendant.  At trial, an engineer testified that a portion of the platform was towed to the location where the accident occurred; the structure was assembled there.  The structure included sixteen tendons, which connected to "sixteen pilings that are 96 inches in diameter and penetrate the soil 396 feet into the subsoil."  *Id.* at *2.  The defendant intended the platform to remain at that location for decades, and then planned on disassembling and scrapping it once it was no longer of use.  "Any contemplated movement of this monstrous facility would be a massive engineering feat requiring up to two years of engineering and deconstruction."  *Id.*

---

[7] Defendant argues that the lines attached to Barge ACBL 2870 are used to run electrical cords to pumps. (*See* Def.'s App'x to Reply in Supp. of Mot. for Summ. J., Ex. B.) The photograph to support this allegation, however, is not definitive evidence proving whether the pumps are a part of Barge ACBL 2870, or that the pumps are parts of other pieces of equipment temporarily resting on Barge ACBL 2870 or another barge.

The court held that the "structure was extensively modified when it arrived at its current location and would require extensive modification to engage in maritime transportation again. Thus, it is not a vessel." *Id.*  The court granted a summary judgment motion filed by the defendant.  *Id.* at *3.

Defendant argues the spud in this case is similar to the pilings in *Jordan*, but this case is clearly distinguishable.  Unlike *Jordan*, there is little evidence in this case that Barge ACBL 2870 was significantly modified after being brought to the Burrell Yard.  The only evidence of a modification was the cutting of the spudwell and the insertion of the spud; there is evidence that single spud attached to Barge ACBL 2870 can easily be removed. Also of note is that in *Jordan*, the court did not decide the motion for summary judgment until **after** trial.  *Id.* at *1 ("The Court issued an Order Carrying Defendants' Motion for Summary Judgment with trial.").  The court stated that "the pre-trial Record was still permeated with factual nuances regarding [the platform]'s design that would cause reasonable minds applying the *Stewart* definition to differ." *Id.* at *1.  After evidence was presented, the court explained that it found, and presumably the jury also found, that the defendant's engineer was credible.  *Id.*

Although the facts of the current matter and the facts of *Cope* are similar, the two cases can be distinguished. Barge ACBL 2870 was moored in 2003, four years prior to the accident. Prior to being purchased by MIMCO, Barge ACBL 2870 was used for maritime transportation. *Cope*, on the other hand, involved a dry dock that had been moored in the same location for more than twenty years. There is expert testimony that the mooring and spud of Barge ACBL 2870 could be easily removed and the barge would be transportable if certain steps were taken; no such evidence was adduced in *Cope*. Accepting plaintiff's version of the facts as true, Barge ACBL 2870 can quickly and relatively inexpensively be returned to its maritime function. Once

the spud is removed, according to plaintiff, the watercraft will be capable of maritime transportation. In light of all evidence presented by plaintiff, there is a genuine issue of material fact about whether Barge ACBL 2870 was a vessel.

In order to recover under the LHWCA in this case, plaintiff must demonstrate that the injured party can recover under the LHWCA and that the injury occurred on a vessel. There are genuine issues of material fact whether Blaine Martin was a longshore or harbor worker as required under the LHWCA and whether Barge ACBL 2870 was a vessel. Summary judgment must be denied in respect to count III.

## C. Count IV (Negligence/Maritime Tort) of the Complaint

In count IV of the complaint, plaintiff asserted a claim of negligence under general maritime law. Defendant moved for summary judgment on count IV because defendant believes that plaintiff lacks jurisdiction in federal court. The defendant argues that Blaine Martin's injury did not occur on a vessel. Because the injury did not occur on a vessel, the defendant believes that the federal courts have no jurisdiction over plaintiff's general maritime law claim.

In order to assert a claim of negligence under general maritime law, the plaintiff bears the burden of establishing admiralty jurisdiction. *Jerome B. Grubart*, 513 U.S. at 534. In order to establish admiralty jurisdiction, the plaintiff is required to satisfy two requirements: (1) the plaintiff must demonstrate that the injury occurred on navigable waters or was caused by a vessel on navigable waters and (2) that the incident must bear a significant relationship to traditional maritime activity. *Executive Jet Aviation, Inc. v. City of Cleveland*, 409 U.S. 249, 254-61 (1972). The standard for whether a ship is a vessel under general maritime law is set forth 1 U.S.C. § 3. *Colonna's Shipyard, Inc. v. U.S.A.F. General Hoyt S. Vandenberg*, 584 F. Supp. 2d 862, 868 n.6

(E.D. Va. 2008). While defendant contests whether the injury occurred on navigable waters or was caused by a vessel on navigable waters, defendant does not dispute that plaintiff adduced sufficient evidence raising a genuine issue of material fact over the second element – that the incident must bear a significant relationship to traditional maritime activity.

With respect to the first element, to establish admiralty jurisdiction, it must be determined whether Barge ACBL 2870 was a vessel. Defendant believes that plaintiff does not have jurisdiction because Barge ACBL 2870 is not a vessel and therefore does not satisfy the first prong of the admiralty jurisdiction analysis. As discussed above, there is a genuine issue of material fact whether Barge ACBL 2870 is a vessel. Defendant's motion for summary judgment with respect to count IV is therefore denied.

### Conclusion

For reasons set forth above, the court will grant defendant's motion for summary judgment with respect to plaintiff's unseaworthiness (count I) and Jones Act negligence claims (count II). The court will deny defendant's motion for summary judgment with respect to plaintiff's claim under the LHWCA (count III) and negligence under general maritime law (count IV).

By the court:

Dated: September 16, 2009                        /s/ JOY FLOWERS CONTI

                                                 Joy Flowers Conti
                                                 United States District Judge